UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                            Case No. 8:21-cr-374-VMC-CPT

BENJAMIN DALE AXON

_____/

## REPORT AND RECOMMENDATION

Before me on referral is Defendant Benjamin Dale Axon's motion to suppress evidence obtained by the Manatee County Sheriff's Office (MCSO) as a result his arrest in July 2021.[1]  (Docs. 23, 69).   Axon's arrest stemmed from the events surrounding a traffic stop performed by the MCSO roughly nine months earlier, in October 2020, when Axon was the passenger in a car being driven by his one-time girlfriend, Corinthian Jones.   That stop was predicated upon a traffic infraction allegedly committed by Jones and led to the discovery of a weapon purportedly belonging to Axon following a warrantless search of Jones's vehicle.  Axon, who was a felon at the time, fled the scene, and his subsequent apprehension in July 2021 was based on the arrest warrants issued after he absconded.

---

[1] This evidence consists of a Springfield Armory XD-9 firearm (Serial No. BY477064), nineteen rounds of ammunition, a Pioneer Arms Corp Hell Pup AK-47 (Serial No. 1133624), forty-two 7.62 rounds in an extended magazine, twenty-one grams of suspected crack cocaine, 5.4 grams of marijuana, and statements Axon made after his arrest.  (Doc. 44).

In support of his instant motion, Axon contends that the evidence obtained during his July 2021 arrest must be suppressed under the "fruit of the poisonous tree" doctrine because the October 2020 traffic stop and the attendant search of Jones's car were unlawful.  (Docs. 23, 69); (Doc. 55 at 6–9); (Doc. 62 at 47).  The government disagrees and urges the Court to deny Axon's motion.  (Docs. 29, 68).

An evidentiary hearing was held on the matter,[2] at which the government called two witnesses (1) former MCSO officer Shayne Rousseau, who conducted the stop of Jones's vehicle in October 2020; and (2) MCSO deputy Joseh Ferreira, who arrested Axon in July 2021.  (Doc. 55).  For his part, Axon called (1) Jones (who Axon subpoenaed to appear at the hearing), and (2) an MCSO records custodian, Sharon Chasteen.  (Docs. 55, 62).  Axon did not testify.  *Id.*

Following the hearing, I entered an Order directing the parties to file proposed findings of fact and conclusions of law.  (Doc. 61).[3]  The parties did so (Docs. 68, 69), and I then heard oral argument on Axon's motion.  The parties submitted a joint notice a week later addressing one of the issues discussed at oral argument.  (Doc. 77).

After careful review of the parties' submissions, the testimony and exhibits adduced at the evidentiary hearing, the arguments and representations made at oral argument, and other pertinent portions of the record, I respectfully recommend that

---

[2] The hearing took place over two separate days due to the fact that Jones was unable to appear at the initial hearing for personal reasons.  (Doc. 55 at 10–11).

[3] The Order made clear that the parties should include in their filings all the facts and legal authority they wished the Court to consider and should not incorporate by reference any other legal memoranda. (Doc. 61).

Axon's motion be denied.  Below are my findings of fact and conclusions of law that lead me to this recommendation.  Unless otherwise indicated, my factual findings are based upon my assessment of the weight of the evidence offered by the parties, including the testimony of the above-referenced witnesses.

I.

A.

During the early morning hours of October 26, 2020, MCSO Detective Rousseau was on patrol in the area of First Street and 26th or 30th Avenue in Bradenton, Florida.  (Doc. 55 at 15, 17–18, 28–29).  The weather that night was clear, and the pavement was dry.  *Id.* at 19.  Rousseau was driving an unmarked black Chevy Tahoe that was "the same style Tahoe" as all the police units used by the MCSO.  *Id.* at 17, 70.  It was equipped with a spotlight and a large "police[-]style push bumper" in the front "with lights . . . attached to it."  *Id.* at 17, 70, 85.  As described by Rousseau, his police SUV "look[ed] very similar to a cop car" and was "pretty obvious[ly] . . . a patrol vehicle."  *Id.* at 17, 70.  Neither Rousseau nor his Tahoe were outfitted with cameras, however, as those devices had not yet been deployed throughout the MCSO.  *Id.* at 34, 76.[4]

By that point in his career, Rousseau had been an officer with the MCSO for roughly nine years and was assigned to the MCSO's Violent Crimes Task Force.  *Id.*

---

[4] Rousseau testified that the MCSO DUI units typically had vehicles with videos.  (Doc. 55 at 34).

at 15, 17, 28–29, 35, 77.[5]  In that role, Rousseau was charged with, among other duties, responding to "violent crime call[s]" and engaging in proactive policing.  *Id.* at 35–36. Before becoming a detective, Rousseau served as a MCSO deputy for approximately four years, where he had been tasked with stopping vehicles for traffic violations, in addition to other responsibilities.  *Id.* at 19–20, 77.  Whether as a deputy or detective, Rousseau did not "writ[e] a whole lot of citations" because he was a "big proponent of . . . informing people of the laws and hoping that they [would] make better decisions in the future without a monetary fine."  *Id.* at 30.[6]  As pertinent here, his training and experience to that juncture included visually estimating the speeds of vehicles, conducting hand-to-hand transactions for marijuana, searching cars and other locations for marijuana, and working with firearms as a member of the MCSO's SWAT team.  *Id.* at 16, 27.  With respect to his approach to policing, Rosseau viewed himself as an officer "who thinks outside the box."  *Id.* at 33.

While traveling north on First Street at approximately 2:00 a.m. on October 26, Rousseau saw a black Acura—later determined to be driven by Jones and occupied by Axon—heading in the opposite direction.  *Id.* at 17–18, 73; (Doc. 50-9); (Doc. 62 at 6–

---

[5] At the time of his testimony, Rousseau was working as an officer with the Tampa Police Department. (Doc. 55 at 15).

[6] Chasteen testified that she is the MCSO's Director of Records and located one traffic citation written by Rousseau in the MCSO's TRaCS system.  (Doc. 55 at 115–16).  Chasteen conceded, however, that the MCSO had only been using the TRaCS system since 2016 and that there could be instances where an officer's citations would not be reflected in that database.  *Id.* at 116–17.  Rousseau acknowledged that he had only issued "[m]aybe a dozen" traffic tickets from 2016 until he left the MCSO but explained that this was due, in part, to the fact that some of the positions he held at the MCSO "weren't geared towards traffic stops."  *Id.* at 78.

9).[7]  According to Rousseau, the Acura came "out of [a] curve" in the road traveling "pretty fast" and, although Rousseau did not have enough time to assess the pace of the vehicle, it "[l]ooked [to him] like it was speeding."  (Doc. 55 at 18, 68–73).  As a result, Rousseau made a U-turn and, when he did, the Acura "immediately made a right turn and then another right turn to head back northbound in the direction that [it] just came" into some neighborhoods.  *Id*. at 18, 68–71.  Based upon his law enforcement background, Rousseau found this "odd pattern" of maneuvers to be a "little weird" and indicative of someone who was potentially engaged in illegal activity attempting to "just dip off and not be in [his] vision anymore."  *Id*. at 19, 71.  As he explained during his testimony:

> Typically when people see law enforcement vehicles and if they may not be up to any good, they try to get out of sight, out of mind as quick[ly] as they can.  It's a very typical response that I've seen over my career, and that's what caused me to have my suspicions.

*Id*. at 70; *see also id*. at 30–31.

Given his evaluation of the situation and drawing on his narcotics training, Rousseau decided he would "do a traffic violation on the car."  *Id*. at 19.  Rousseau testified in this respect that once he developed a "suspicion about a vehicle" he would "wait for [the driver] to commit a traffic infraction . . . so that he [could] investigate what's going in [the] vehicle."  *Id*. at 30, 33; *see also id*. at 77.  Rousseau insisted,

---

[7] Jones testified that she was taking Axon to his home that night.  (Doc. 62 at 18).

however, that this tactic did not include "mak[ing] up" traffic violations or otherwise "going outside of the rules." *Id.* at 33–34.

Rousseau began to follow the Acura but it took him a "few blocks" to position himself behind the automobile because it was "driving a little bit fast." *Id.* at 19, 72. By the time he caught up to the Acura, the car was approaching the intersection of 3rd Street West and 13th Avenue West. *Id.* at 19–22, 41; (Docs. 50-2, 50-30). That intersection had a stop sign on the corner facing the direction of the oncoming Acura, as well as a pedestrian walkway immediately adjacent to the stop sign. (Doc. 55 at 22, 41); (Docs. 50-2, 50-30). Of significance here, the intersection also had a thick white line—known as a "stop bar" or "stop line"—painted on the ground in front of the stop sign. (Doc. 55 at 19–22, 75); (Docs. 50-2, 50-12). The stop line extended from the curb along the side of the road to roughly the mid-point of the street. (Doc. 55 at 19–22, 42, 75); (Docs. 50-2, 50-12).

With his headlights and those of the Acura illuminating the area, Rousseau "observed the [Acura's] front tires roll past the stop bar and a little bit into" the pedestrian walkway. (Doc. 55 at 20–23, 74–75, 79). Even though Rousseau was behind the Acura, he could see the car pass over the stop bar because the bar was wider than the automobile. *Id.* at 42–46, 74–75. When pressed on this issue on cross examination, Rousseau emphasized that the stop bar went "all the way" to the edge of the curb, "so [that] unless [the automobile was] riding on the curb, [he]'d be able to see" if the vehicle crossed it. *Id.* at 75.

In light of his observations, Rousseau deemed the driver of the Acura to have violated Florida Statute § 316.123(2)(a), which prohibits motorists from failing to stop "at a clearly marked stop line." Fla. Stat. § 316.123(2)(a). As a result, Rousseau determined he would stop the vehicle "to see what was going on," particularly given the earlier questionable maneuvers the driver had undertaken. (Doc. 55 at 23, 50–51); (Doc. 50-6). Rousseau then proceeded to follow the car and commenced "call[ing] out a traffic stop over the radio." (Doc. 55 at 20). Rousseau explained that this process "takes a little bit of time" and involves providing his location, relaying the license plate number of the targeted automobile once he is able to ascertain it, and "maybe even entering the tag in to check for any stolen records or anything on [his] laptop." *Id*. at 21, 50–51, 76.

Rousseau continued to drive behind the Acura for several blocks and eventually located "a safe place to pull the car over," which he accomplished by activating his emergency lights. *Id*. at 21, 23, 45–48, 75; (Doc. 55-12).[8] Rousseau thereafter exited his SUV and approached the driver-side window of the Acura. (Doc. 55 at 24, 63). As he did, Rousseau could see the driver (Jones), as well as the front seat passenger (Axon), and "immediately noticed an odor of marijuana emitting from the vehicle." *Id*. at 24; *see also id*. at 54. Rousseau recognized the smell of marijuana from his years of training and experience. *Id*. at 16, 24, 56–57. When he subsequently collected

---

[8] Specifically, the Acura entered the intersection of 3rd Street West and 13th Avenue West and made a left turn across traffic; traveled one block and then turned right; and then travelled two blocks before making a left turn. (Doc. 55 at 44–54, 82–83); (Doc. 62 at 11–12); (Doc. 50-30).

Jones's driver's license and information, Rousseau additionally noticed that Axon "was kind of a little bit nervous," that he was "clenching" or "gripping a backpack in between his legs," and that he "wouldn't really make eye contact or look at" Rousseau, which Rousseau "thought was kind of odd." *Id.* at 24, 63–64.

Rousseau returned to his SUV, ran Jones's information, and, having smelled marijuana emanating from the Acura, put in a request for "some back-up." *Id.* at 24–25. As he was undertaking these tasks, Rousseau observed Axon through the windows of the Acura—which were not tinted, *id.* at 36—"t[ake] the [backpack] from the area . . . where it was and . . . put it into the back seat," *id.* at 64; *see also id.* at 25.

MCSO deputy Christopher Houghton arrived at the scene in response to Rosseau's call for back-up. *Id.* at 25, 55, 118. At that point, Rousseau went back to the Acura, advised Jones and Axon that he was going to search the automobile "based on the odor of the marijuana," and was informed by Jones that she and Axon "had just finished smoking in the vehicle." *Id.* at 25; *see also id.* at 55, 58–60, 66, 68. During the ensuing search of the car, which Rousseau performed without a warrant, Rousseau found a loaded firearm in the middle compartment of Axon's backpack, along with business cards and a magazine bearing Axon's name, among other items. *Id.* at 26–27, 59, 64–65, 83, 86; (Docs. 50-13, 50-14, 50-16). Rousseau did not locate any marijuana in the automobile, however, nor did he find any marijuana on Axon or Jones's person. (Doc. 55 at 59). Rousseau also did not discern Jones to be impaired, although he was not trained to make such determinations. *Id.* at 66–68.

For safety reasons, Rousseau decided to detain Jones and Axon at that juncture. *Id.* at 27, 83–84. When Rousseau went to grab one of Axon's wrists, however, Axon managed to escape Rousseau's grasp and began to run away. *Id.* at 27. Rousseau deployed his Taser and, when that proved unsuccessful, he and Houghton pursued Axon on foot but were unable to locate him. *Id.* at 27–28, 84. At least one other police car arrived at the location as these events were unfolding. *Id.* at 84–85.

Rousseau later wrote two arrest warrants for Axon after checking Axon's criminal history. *Id.* at 28. The first warrant was for resisting/obstructing an officer without violence and the second was for being a felon in possession of a firearm. *Id.*; (Doc. 50-6). Rousseau did not issue a traffic citation to Jones. (Doc. 55 at 30, 66–67).

Jones offered a different version of the circumstances surrounding the October 26, 2020, stop. A home health aide who had previously dated Axon for three years, Jones denied that she committed any traffic infraction that night and instead insisted that she "obey[s] traffic laws" and "always stop[s] at stop signs." (Doc. 62 at 6–7, 12, 18, 22, 25, 27). Jones also claimed that Rousseau told her she was being pulled over for speeding, *id.* at 10, not for failing to stop at the stop line. Jones further asserted that Rousseau did not tell her why he was going to search her vehicle and that she did not admit she and Axon had just smoked marijuana in the car. *Id.* at 15, 19. Jones did acknowledge, however, that she told Rousseau she had smoked marijuana before she got into the Acura. *Id.* at 15.

B.

Nearly nine months later, on July 13, 2021, Axon was again riding as a front passenger in Jones's car. *Id.* at 95–96; (Doc. 62 at 21). This time, Jones was driving a Nissan Altima with one of its front headlights out and was traveling back to her home after doing laundry at a friend's house. (Doc. 62 at 21, 31–32); (Doc. 50-8).

MCSO deputy Ferreira was working out of a patrol division at the time and was outfitted with a body camera. (Doc. 55 at 95, 101–02). He observed Jones's headlight infraction, activated the lights on his marked police car, radioed in the traffic stop, and pulled over the Nissan. *Id.* at 95–96, 104. Ferreira then approached Jones's car and advised her why she was being stopped. *Id.* at 97. In response, Jones admitted that she knew one of her lights was not working. *Id.*

During this initial interaction with Jones, Ferreira "immediately recognized a difference" between Jones's demeanor and that displayed by Axon. *Id.* According to Ferreira, in contrast to Jones, who was "very open" and "friendly," Axon was nervous, uncommunicative, reluctant to make eye contact, and had his hands positioned awkwardly at his side. *Id.*

When Ferreira asked for Jones's driver's license, insurance, and registration, Jones instructed Axon to retrieve the latter document from the glove compartment, which Axon did. *Id.* at 97–98; (Doc. 62 at 32). Axon then passed the registration to Jones, all the while maintaining his arms at his side in a way that indicated to Ferreira that Axon was trying to keep the jacket he was wearing "from opening and exposing whatever he may have had concealed." (Doc. 55 at 97–98).

Turning his focus to Axon, Ferreira asked Axon for his identification, which he claimed he left at home.  *Id.* at 98.  Axon additionally gave Ferreira a fake name and a fake date of birth.  *Id.*  The manner in which Axon did so suggested to Ferreira that Axon was being deceptive.  *Id.*

Upon returning to his patrol vehicle, Ferreira researched the identifying information provided by Axon and learned that it was false.  *Id.* at 99.  When Ferreira confronted Axon about his misrepresentations, Axon offered his true name and date of birth.[9]  *Id.* at 99–100.  Ferreira then entered Axon's real identity and birthdate into his system and discovered that Axon was wanted on the October 2020 warrants issued by Rousseau.  *Id.* at 100–01.

Accompanied by a backup officer who had arrived on the scene, Ferreira then directed Axon to step out of the car and handcuffed him.  *Id.*  Upon searching Axon, Ferreira discovered drugs and a firearm on his person, as well as another gun inside the vehicle.  *Id.* at 110; (Doc. 62 at 33); (Doc. 50-8).  Ferreira also allegedly obtained a number of post-Miranda admissions from Axon.  (Doc. 50-8).

As for Jones, Ferreira found her with some marijuana but did not charge her after she produced a valid medical marijuana card.  (Doc. 55 at 111).  Ferreira additionally did not issue a traffic citation to Jones, opting instead to give her a verbal warning regarding the headlight violation.  (Doc. 50-8).  The entirety of Ferreira's

---

[9] Although Jones testified that she did not remember Axon giving Ferreira a fake name (Doc. 62 at 32–33), Ferreira's recounting of the stop—including Axon's statements—was recorded on Ferreira's body camera, (Doc. 55 at 101–02).

encounter with Jones and Axon was recorded on Ferreira's body camera and was admitted at the evidentiary hearing.  *See* (Doc. 55 at 102–03); (Doc. 50-3).

Axon was ultimately indicted by a federal grand jury in November 2021 on two counts of being a felon-in-possession of a firearm based on the evidence obtained in connection with the October 2020 traffic stop and his July 2021 arrest.  (Doc. 1). Roughly thirteen months later, in January 2023, the government sought and received the Court's permission to dismiss the count pertaining to the October 2020 stop because Axon pleaded guilty to the underlying conduct in state court.  (Docs. 46, 53, 54).  The government has since represented that it will not rely on any evidence seized during the October 2020 stop, except for the existence of the arrest warrants.  (Doc. 55 at 6); (Doc. 68 at 2 n.1).

## II.

## A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The Amendment's protections, however, extend only to items or places in which a person has a "constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  The question of "whether an individual has a reasonable expectation of privacy in the object of [a] challenged search[ ] has come to be known colloquially . . . as Fourth Amendment 'standing.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc).

12

To establish Fourth Amendment standing, a person must have "both a subjective and an objective expectation of privacy" in the item or place searched. *United States v. King,* 509 F.3d 1338, 1341 (11th Cir. 2007) (per curiam) (citation and quotation marks omitted). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.*

A traffic stop constitutes a seizure under the Fourth Amendment. *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). And because a passenger, like a driver, is "seized" for Fourth Amendment purposes during a stop, he may challenge the stop's constitutionality. *See Brendlin v. California*, 551 U.S. 249, 257–58 (2007); *Lewis v. United States.,* 491 F. App'x 84, 85 (11th Cir. 2012) (per curiam) ("The passenger of a vehicle may challenge the constitutionality of the vehicle's stop.") (citing *Brendlin*, 551 U.S. at 251). That said, a passenger generally does not have standing to contest a search of the interior of the automobile, *United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018) (quoting *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009)), but does have standing to challenge the search of his belongings that are located inside the vehicle, *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (ruling that a passenger in a vehicle has a reasonable expectation of privacy in his belongings, such as a bag).

In this case, Axon argues that he has standing to contest the constitutionality of both the October 2020 stop of the Acura and the subsequent seizure of the weapon from his backpack. (Doc. 69 at 10–11). Although the government initially asserted in response to Axon's motion that he lacked standing to challenge the search of Jones's

13

vehicle or the backpack (Doc. 29 at 9), the government did not advance this contention in its findings of fact and conclusions of law (Docs. 61, 68).  As such, the government has waived the argument given the explicit terms of the Court's Order establishing the parameters of the parties' briefing.[10]  (Doc. 61).

Even were the Court not to find a waiver, the government's standing contention fails in any event.  The Eleventh Circuit's published decision in *Barber* is instructive in this regard.  In that case, law enforcement stopped a car in which the defendant— Barber—was a passenger.  *Barber*, 777 F.3d at 1304.  The police thereafter arrested the car's driver for operating the vehicle with a suspended license and, after obtaining the driver's consent, searched the automobile.  *Id.* During the course of that search, the officers located a bag on the passenger-side floorboard which contained a gun, along with personal items belonging to Barber.  *Id.*

On appeal, the government asserted that Barber did not have standing to challenge the search of his bag.  *Id.*  The Eleventh Circuit rejected this assertion, reasoning:

> In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .  [In this case,] Barber had a subjective expectation of privacy in his bag, which contained his business cards, computer flash drives, and photographs of Barber with his children. Barber's expectation of privacy was also objectively reasonable. In *United States v. Freire*, police found the

---

[10] When I broached the matter of the waiver at oral argument, the government stated that its failure to raise the standing issue in its post-hearing submission stemmed from its misreading of the Court's Order.   Recognizing its error, the government—to its credit—advised the Court that it would waive its standing challenge.

defendant's briefcase during a search of a third party's car. The defendant had given the briefcase to the third party for safekeeping and was not present during the search. This Court held that the defendant had an objectively reasonable expectation of privacy in his briefcase and could challenge the search. If the defendant in *Freire* had a reasonable expectation of privacy in his belongings, so did Barber.

*Id.* at 1305 (internal quotation marks and citations omitted).

The government does not mention, much less distinguish *Barber*, in its initial response. (Doc. 29 at 8–9). Instead, it relies on decisions holding that a passenger with no possessory interest in a car has no legitimate expectation of privacy in the automobile's interior because he has no right to exclude others from the vehicle. (Doc. 29 at 9) (citing *Byrd v. United States*, 138 S. Ct. 1518, 1528–29 (2018); *Dixon*, 901 F.3d at 1338). The problem with this line of authority—as the Eleventh Circuit pointed out in *Barber*—is that it only "address[es] a passenger's expectation of privacy in a car, not a passenger's expectation of privacy *in a bag within a car*." *Barber*, 777 F.3d at 1305 (emphasis added) (distinguishing *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)). Deeming that caselaw inapposite, the *Barber* court concluded that "Barber had standing to challenge the search of his bag, even if he lacked standing to contest the search of the car." *Id.*

Here, the government does not dispute that the backpack seized from Jones's Acura during the October 2020 stop belonged to Axon. Nor could it validly do so. Rousseau saw Axon in possession of the backpack after he pulled over Jones's vehicle and also found a number of items, including Axon's business cards, inside the bag. Indeed, it would seem that the government's central premise for originally charging

Axon with the weapon discovered in the backpack is that the backpack belonged to him.  Against this backdrop, the Eleventh Circuit's ruling in *Barber* is fatal to the government's standing challenge.[11]

B.

A traffic stop is constitutional if an officer had reasonable suspicion to believe that criminal activity occurred.  *Campbell*, 26 F.4th at 880 & n.15  (observing that while probable cause is adequate to stop a vehicle, the Supreme Court has "made clear" that "only reasonable suspicion is necessary") (citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)); *see also Baxter v. Roberts*, 54 F.4th 1241, 1256 (11th Cir. 2022) ("A traffic stop is constitutional if the officer had reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur.") (citing *Campbell*, 26 F.4th at 880).[12]  "Even minor traffic violations qualify as criminal activity" under this framework.  *Campbell*, 26 F.4th at 880; *see also United States v. Harris*, 2023 WL 3043647,

---

[11] The government does not separately argue that Axon lacks standing because he abandoned the backpack when he fled.  As a result, the government has waived any such challenge.  *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.") (citation omitted), *overruled in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir 2015); *Mendoza v. U.S. Atty. Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no argument was made) (citations omitted); *cf.* (Doc. 69 at 11 n.19) (Axon asserting that "[a]ny potential [abandonment] argument" by the government is factually unsupported) (citing *United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir. 1994)).

[12] In *Baxter*, the Eleventh Circuit acknowledged that it "ha[d] sometimes indicated [in the past] that probable cause, rather than reasonable suspicion, [was] necessary to justify a traffic stop in which the reason for the stop is a potential traffic violation rather than suspicion of other criminal activity."  54 F.4th at 1256 n.9 (citing *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019)).  As the Eleventh Circuit observed in its *en banc* opinion in *Campbell*, however, "'reasonable suspicion is all that is required' to justify any type of traffic stop."  *Id.* (citation omitted).

at *3 (M.D. Fla. Apr. 21, 2023) ("[A]n officer making a traffic stop must have reasonable suspicion[.]") (citing *Campbell*, 26 F.4th at 880 & n.15); *Hayes v. Sec'y, Fla. Dep't of Corr.*, 2020 WL 7138570, at *5 (M.D. Fla. Dec. 7, 2020) ("To comply with the Fourth Amendment, the officer must have reasonable suspicion to conduct the traffic stop.") (citing *Heien*, 574 U.S. at 60).

Reasonable suspicion is a "less demanding standard than probable cause," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), and requires only that "an officer making a stop have 'a particularized and objective basis for suspecting the person stopped of criminal activity,'" *Campbell*, 26 F.4th at 880 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)); *Baxter*, 54 F.4th at 1256 (same) (citing *Campbell*, 26 F.4th at 880). Courts look to "the totality of the circumstances" in determining whether an officer's actions meet this threshold. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Courts also view the existence of reasonable suspicion "from the standpoint of an objectively reasonable police officer." *United States v. Flippo*, 759 F. App'x 907, 908 (11th Cir. 2019) (per curiam) (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)). The subjective intentions of an officer are therefore irrelevant in analyzing the constitutionality of a traffic stop. *Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").

Even if an officer's evaluation of the facts in making a traffic stop is incorrect, the stop will still be deemed to be valid as long as the officer's assessment was

reasonable. *Chanthasouxat*, 342 F.3d at 1276 ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.") (collecting cases). "Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable." *Id*. "Great deference is given to the judgment of [a] trained law enforcement officer[ ]" in this respect. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 205–06 (2001)).

Applying these maxims to the facts in this case, I find that Rousseau had at least reasonable suspicion to believe that Jones violated section 316.123(2)(a) of the Florida Statutes. As alluded to above, this provision states, in pertinent part:

> Except when directed to proceed by a police officer or traffic control signal, *every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line*, but if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

Fla. Stat. § 316.123(2)(a) (emphasis added). Courts interpreting this law have found that it requires an automobile to stop before any part of the vehicle crosses the stop line. *United States v. Brown*, 2020 WL 7238501, at *2 (M.D. Fla. Dec. 9, 2020) (collecting cases).

Here, Rousseau—a veteran police officer of roughly nine years—credibly testified that Jones not only drove past the stop line at the intersection of 3rd Street West and 13th Avenue West, but partially into the pedestrian walkway as well. (Doc. 55 at 20–22). In doing so, Rousseau cogently explained how he was able to ascertain

whether Jones's Acura breached the stop line, noting that his vantage point was from only a half-a-car-length back, that the stop line was wider than the Acura, and that the area was sufficiently illuminated by both his headlights and those of Jones's vehicle. *Id.* at 19, 42, 74–75.

In an attempt to undermine Rousseau's recounting of the incident, Axon asserts that Rousseau's testimony on the matter was in direct conflict with Jones's version of events and was also uncorroborated by any "video or witness testimony." (Doc. 69 at 13–14). Axon additionally argues that Rousseau's "'out of the box' mindset" to policing, his "questionable tactics" of "waiting for drivers to commit alleged traffic infractions so he may proactively investigate their personal lives," and the paucity of tickets he has issued over the years "raise[ ] serious questions about whether traffic infractions ever underlie his traffic stops." (Doc. 69 at 13–15 & n.22). These contentions do not survive scrutiny.

To begin, I did not find Jones's testimony to be particularly persuasive based upon my assessment of her demeanor and her responses to the questions posed to her. By way of example, in contrast to Rousseau's description of the stop, Jones offered a far more conclusory version of the event, essentially claiming that she was certain she stopped at the stop line because she "obey[s] traffic laws" and "always stop[s] at stop signs." (Doc. 62 at 12, 22). Jones's suggestion that she could not possibly have crossed the stop line because she never commits a traffic infraction strains credulity. *Wren*, 517 U.S. at 818 (acknowledging the argument that "the multitude of applicable traffic and equipment regulations is so large and so difficult to obey perfectly that *virtually*

19

*everyone is guilty of violation*") (emphasis added) (internal quotations omitted).  This is especially true given that it is uncontested Jones committed a separate traffic infraction less than a year later, in July 2021, for a broken headlight which—according to Ferreira—she knew was not working.  (Doc. 55 at 97).[13]

        As for the matter of corroboration, that argument cuts both ways.  Although it is true that Rousseau's testimony about the October 2020 stop largely rests on his word, the same is true of Jones's testimony.  The one difference—at least as far as documentary proof is concerned—is that Rousseau's testimony about Jones's traffic infraction (Doc. 55 at 20) comports with his report, in which he attests that Jones's Acura "stopp[ed] past the stop bar before entering traffic at 3rd St W and 13th Ave W."  (Doc. 50-6).[14]  Defense counsel's efforts on cross examination to undermine Rousseau's recounting of the stop, while robust, were unconvincing.[15]  Given the

---

[13] There are other portions of Jones's testimony that I have difficulty crediting, including, by way of example, her assertion that after the she went through the intersection with the stop bar, she had no idea Rousseau was following her for several blocks (Doc. 62 at 13) even though he was driving an SUV equipped with a spotlight and a large "police[-]style push bumper" in the front "with lights . . . attached to it" that was "pretty obvious[ly] . . . a patrol vehicle" (Doc. 55 at 17, 70, 85–86).

[14] The defense intimated at one point that Rousseau's report regarding the October 2020 stop was not completed until many months later, on July 16, 2021.  (Doc. 23 at 3 n.1).  After raising this issue with the parties at oral argument, the government filed a notice stating that, although the July 16, 2021, date did appear on the face of the report, this date reflected when a case agent "accessed and printed the report[,] not when the report was written."  (Doc. 77).

[15] By way of example, counsel sought to show that Rousseau's testimony conflicted with his report by pointing out that the report did not mention Jones was driving "weird" or "fast," as Rousseau testified Jones was doing prior to being pulled over for the stop bar violation.  (Doc. 69 at 14); (Doc. 55 at 39).  The problem with this line of cross examination is that the clear focus of Rousseau's report was not on Jones's driving patterns but the subsequent arrest warrants Rousseau issued for Axon for being a felon in possession of a weapon and for resisting/obstructing an officer without violence.  (Doc. 50-6).  This is evidenced by the fact that other than several sentences at the beginning of the narrative

circumstances presented, the fact that the government did not introduce any video evidence or other eye-witness testimony relative to the stop does not alter my reasonable suspicion analysis.

I likewise find meritless Axon's assertion that the Court should reject Rousseau's description of the stop simply because he did not cite Jones for the stop line violation.  Rousseau testified—as discussed earlier—that he had not "written a whole lot of citations" over the course of his career because he was a "big proponent of . . . informing people of the laws and hoping that they [would] make better decisions in the future without a monetary fine."  (Doc. 55 at 30).  In fact, as also referenced previously, Rousseau stated that he had only issued "maybe a dozen" traffic citations since 2016.  *Id.* at 77–78.[16]  In light of this testimony, which I found to be credible, the mere fact that Rousseau elected not to cite Jones for a traffic violation is unexceptional.  This is especially so since the stop of Jones's car evolved into something far more consequential than a mundane stop bar violation.  In particular, it included the search of Jones's vehicle, the discovery of a weapon on the rear seat in the backpack of a felon (Axon), the attempt by Rousseau to secure Axon outside the car, Axon's subsequent flight from the scene, and the ensuing efforts by Rousseau and Houghton to apprehend

---

portion of the report which mention Jones "stop[ped] past the stop bar," the remainder of the report is entirely dedicated to the events that followed the stop of Jones's Acura.  *Id.*

[16] The evidence tendered by the parties as to the precise number of traffic citations written by Rousseau was a bit muddled.  As discussed earlier, the MCSO records custodian—Chasteen—testified that she located only one such citation in MCSO's electronic records system but acknowledged that this figure would not include any non-electronic tickets authored by Rousseau.  (Doc. 55 at 115–17).  I assume for purposes of this report that Rousseau did not issue many citations.

Axon on foot.[17]  I also note that Ferreira similarly did not issue a traffic citation to Jones for her headlight infraction when he pulled her over nine months later, even though she apparently confessed to being aware of the problem.

Axon's contention that it was improper for Rousseau to "wait" for Jones to commit a traffic infraction so that he could "proactively investigate" the contents of the Acura (Doc. 69 at 13) fares no better.  It is well settled that an officer's racially neutral motives in stopping a car are irrelevant to the propriety of the traffic stop under the Fourth Amendment.[18]  *Whren*, 517 U.S. at 813 ("We of course agree . . . that the Constitution prohibits selective enforcement of the law based on considerations such as race[, but] . . . . [s]ubjective intentions play no role in ordinary . . . Fourth Amendment analysis" relative to traffic stops); *Flippo*, 759 F. App'x at 909 (stating that law enforcement's reasons for making a traffic stop did not invalidate "what [was] otherwise objectively justifiable behavior under the Fourth Amendment") (quoting *Harris*, 526 F.3d at 1337); *United States v. Dericho*, 2015 WL 5687766, at *14 (M.D. Fla. Sept. 25, 2015) ("[A] lawful traffic stop does not violate the Fourth Amendment regardless of an officer's subjective intent[.]").  This includes an officer's

---

[17] I find unconvincing as well Axon's suggestion that Jones's lawful driving *after* the stop bar infraction is of any moment.  By the time Jones traveled through the intersection at 3rd Street West and 13th Avenue West, Rousseau was immediately behind her in what he described to be a "pretty obvious" police SUV.  (Doc. 55 at 17, 70).  That Jones was purportedly driving lawfully when it was likely clear to her that she was being tailed by law enforcement would not be surprising.

[18] In his proposed findings of fact and conclusions of law, Axon mentions that he and Jones are Black (Doc. 69 at 13) but does not assert that the October 2020 was predicated upon their race.  Even if he made such a claim, I do not find credible evidence on the record before me to support such an allegation.

utilization of a traffic violation as a means of conducting a search of an automobile and its occupants. *Whren*, 517 U.S. at 814 ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent."); *United States v. Brown*, 835 F. App'x 551, 552 (11th Cir. 2021) (per curiam) (stating that the officers' "other motivations in initiating the stop—to further investigate [the defendant's] behavior going into and exiting the convenience store or to find a place to effectuate the stop—did not undermine the reasonableness of the stop") (citing *Whren*, 517 U.S. at 813); *United States v. De Los Rios*, 2010 WL 11519243, at *2–6 (S.D. Fla. Jan. 31, 2010) (upholding the validity of a traffic stop even though law enforcement conceded that the purpose of following the defendant "was to catch him committing a traffic violation so that they could stop him and obtain evidence for use in their narcotics investigation").

Axon's related argument that Rousseau "simply conjured up" Jones's traffic infraction so that he could "discover what was going on in her vehicle" is also without merit. (Doc. 69 at 14–15). As noted above, I found Rousseau's testimony regarding the basis for the stop to be credible.

Axon alternatively challenges the October 2020 stop on the ground that Rousseau could not reasonably have concluded the stop line at the intersection was "clearly marked" as required by section 316.123(2)(a) given the "nighttime conditions and [the] poor lighting" in the area. (Doc. 69 at 16); *see also id.* (claiming that the evidence "is far from clear that the stop bar was '*clearly marked*' given it was 2:00 a.m. and the intersection lacked good lighting"). This argument also fails.

23

As discussed previously, Rousseau testified that the illumination provided by the headlights on his SUV and Jones's Acura were sufficient for him to see Jones's vehicle pass over the stop line. (Doc. 55 at 19, 42, 74–75). This testimony makes sense based on the evidence before the Court, and Axon's attempts to refute it are unpersuasive.[19]

C.

Axon next contends that the warrantless search of the Acura during the October 2020 stop violated the Fourth Amendment because the automobile exception did not apply given the circumstances presented and because probable cause was lacking in any event. These arguments fail as well.

---

[19] Axon does not separately argue that the stop line itself was not clearly marked. (Doc. 69 at 16). Even if he had, such a contention would not succeed. At the evidentiary hearing, the parties introduced a number of photographs depicting the intersection at issue. One of those photos, taken in the daytime and introduced by the government as Exhibit 2, shows the entirety of the painted lines of the stop bar and the pedestrian walkway to be in good condition. (Doc. 50-2). The remaining photos, taken in November 2022 (Doc. 62 at 42) and jointly submitted as Exhibits 11–11G, reflected the same lines as having suffered a fair degree of wear and tear (Docs. 50-22, 50-23, 50-24, 50-25, 50-26, 50-27, 50-28, 50-29). Rousseau testified that Exhibit 2 fairly and accurately depicted the condition of the stop bar and the pedestrian lines at the time of the October 2020 stop (Doc. 55 at 88), and that the other photos shown to him—namely, Exhibits 11 and 11A—less so (Doc. 55 at 89–90). By contrast, Jones was shown Exhibits 11, 11A, 11B, 11C, 11F, and 11G and claimed that they fairly and accurately reflected what the intersection looked like (Doc. 62 at 16–18). I found Rousseau's testimony to be more helpful and credible because, among other reasons, it included a comparative assessment of all the images. Regardless, it is evident from my examination of the totality of the evidence, including all the defense photos, that the boundaries of the stop bar, especially at the outer edge toward the curb, were sufficiently demarcated on the night of October 26, 2020, so as to satisfy the strictures of section 316.123(2)(a). I note in this regard that Rousseau's testimony—which I credit—was not that Jones barely crossed the front edge of the stop bar, but that she passed completely through it and into the pedestrian walkway. (Doc. 55 at 20–22).

24

It is well settled that an officer may search a car without a warrant under certain conditions.  *Dixon*, 901 F.3d at 1339.  Known as the automobile exception, the propriety of this type of search emanates from the Supreme Court's longstanding recognition "that there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search."  *Byrd*, 138 S. Ct. at 1526 (citation omitted).  The justifications for this exception are grounded in two particular characteristics of the automobile: its "ready mobility" and the "pervasive regulation" to which it is subject. *Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018) (citing *California v. Carney*, 471 U.S. 386, 390, 392 (1985)). "When these [two] justifications . . . 'come into play,' officers may search an automobile without . . . a warrant so long as they have probable cause to do so."  *Id.* at 1670 (quoting *Carney*, 471 U.S. at 392–93).  Searches authorized under the automobile exception extend to "searches for evidence relevant to offenses other than the offense of arrest."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

To fall within the ambit of the automobile exception, the government must establish that "(1) the vehicle [wa]s readily mobile (*i.e.*, operational); and (2) agents ha[d] probable cause to believe the vehicle contain[ed] contraband or evidence of a crime."  *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006) (citations omitted).  "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances."  *Dixon*, 901 F.3d at 1339 (internal quotation marks and citations omitted).  Courts view the existence of probable cause "from the standpoint of an

objectively reasonable police officer." *Flippo*, 759 F. App'x at 908 (citing *Chanthasouxat*, 342 F.3d at 1276). And if there is probable cause to search a car, then "the police may search all parts of the vehicle, and any containers, therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) (citation omitted).

Axon does not argue that the Acura was inoperative on the night of October 26, 2020. *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003) ("The first [question for the automobile exception] is whether the automobile is readily mobile. All that is necessary to satisfy this element is that the automobile is operational."). Nor could he validly do so, since it is clear from the evidence that Jones drove the vehicle both before and after the traffic stop.

Axon instead contends that the first prong of the automobile exception is not met because the October 2020 stop did not involve "exigent circumstances," which Axon claims undergird the "readily mobile" requirement. (Doc. 69 at 17–20). To buttress this contention, Axon asserts that "the Florida Legislature amended its search warrant statute [in 2013] to specifically provide for electronic signatures by both [the] applicant[ ] and [the issuing] magistrate[.]" *Id.* at 19. Axon goes on to argue that it is therefore "now more than 'reasonably practical' to obtain a search warrant for a vehicle in an expedited fashion, thus alleviating any exigency that previously existed" about the capability of the driver of the car to elude the police. *Id.* (citing Fla. Stat. § 933.07).

The threshold problem with Axon's argument is that it is unsupported.   In *Watts*,  which Axon cites in his post-hearing submission, the Eleventh Circuit rejected the assertion that a showing of an "exigency" beyond the mobility of the car was necessary to invoke the automobile exception.   329 F.3d at 1284–85.   The court in *Watts* explained:

> The automobile exception to the warrant requirement was based *initially* on a car's ready mobility and the exigent circumstances created by that mobility.   In *Carroll[ v. United States*, 267 U.S. 132, 153 (1925)], the Supreme Court recognized that the automobile presented unique issues to law enforcement because officers might not have the opportunity to obtain a warrant without losing sight of the car and because the car might escape if not stopped immediately.

> Indeed, language in early Supreme Court cases *appeared* to require such an exigency in addition to probable cause for a warrantless search of an automobile. . . .   In *California v. Carney*, 471 U.S. 386, 391-92 (1985), however, the Supreme Court articulated an additional justification for warrantless car searches, namely that a car's occupants enjoy a reduced expectation of privacy in their car compared to their home due to the extensive regulation of automobiles.  *Since Carney, the necessity of a special exigency has waned and is now satisfied by the mobility of the car itself.*

*Id*. at 1284–85 (emphasis added and internal citations omitted).

The Eleventh Circuit in *Watts* went on to point out that it too had "recognized the limited showing necessary to justify a warrantless search in *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990)," which is an opinion upon which Axon also relies (Doc. 69 at 18).  *See Watts*, 329 F.3d at 1286.   As the *Watts* court observed, it "specifically rejected the defendant's contention [in *Nixon*] that 'law enforcement agents can justify a warrantless search of an automobile only through some showing

of exigent circumstances *beyond* the exigency inherent in the ready mobility of the vehicle.'" *Id.* (quoting *Nixon*, 918 F.3d at 903).   The *Watts* court further noted that it made it "clear [in *Nixon*] that the requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning." *Id.*

> The Eleventh Circuit concluded in *Watts*:
>
> It is clear from the above caselaw that there are only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile.  The first is whether the automobile is readily mobile.  *All that is necessary to satisfy this element is that the automobile is operational.*

*Id.* (emphasis added).

In decisions subsequent to *Watts*, the Eleventh Circuit and other courts in this District have repeatedly found that the "automobile exception does not contain a special exigency requirement beyond a showing that [a] vehicle is mobile." *United States v. Rodriguez*, 762 F. App'x 938, 942 (11th Cir. 2019) (per curiam) (citing *Watts*, 329 F.3d at 1285); *see also United States v. Alston*, 598 F. App'x 730, 734 n.3 (11th Cir. 2015) ("The absence of exigent circumstances does not affect the validity of the search" pursuant to the automobile exception) (citing *United States v. Johns*, 469 U.S. 478, 484 (1985) and *United States v. Lindsey*, 482 F.3d 1285, 1293 n.6 (11th Cir.2007)); *United States v. Jolly*, 368 F. App'x 17, 19 (11th Cir. 2010) ("The automobile exception does not contain a separate exigency requirement.") (citing *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999)); *United States v. Collins*, 2016 WL 4087472, at *2 (M.D. Fla. Aug. 2,

28

2016) (same), *aff'd*, 699 F. App'x 904 (11th Cir. 2017) (per curiam).  In light of this case authority, the question of whether Rousseau may have been able to obtain an electronically issued warrant is immaterial.[20]

As for the matter of probable cause, Rousseau credibly testified that he smelled marijuana when he approached Jones's Acura.  (Doc. 55 at 25, 54).  And his testimony was confirmed at least in part by Jones's admission that she and Axon had at least smoked before they got into the car.  *Id*. at 25, 58–59.[21]  Well established Eleventh Circuit precedent instructs that a law enforcement official's detection of the odor of marijuana emitting from an automobile alone constitutes probable cause to search the vehicle.  *Nixon*, 901 F.3d at 1339 ("We have explained that an officer's credible testimony that he smelled marijuana can establish probable cause.") (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)); *United States v. Reed*, 2019 WL 2710088, at *6 (M.D. Ala. May 3, 2019) ("Numerous Eleventh Circuit and precedential Fifth Circuit cases unequivocally rule that the odor of marijuana emanating from a vehicle establishes reasonable suspicion or probable cause for officers to search the vehicle.") (footnote omitted) (collecting cases), *report and recommendation adopted*, 2019 WL 2643909 (N.D. Ala. June 27, 2019).

---

[20] Even putting aside this issue, there is not sufficient evidence in the record establishing how long it would actually take an officer to draft and submit an electronic warrant from his police vehicle.

[21] The fact that no marijuana was ultimately found in the Acura does not detract from Rousseau's testimony based upon my evaluation of all the evidence adduced at the hearing.  *See United States v. Salley*, 341 F. App'x 498, 501 n.4 (11th Cir. 2009) (per curiam) (explaining that when an officer testifies that they based their reasonable suspicion on the smell of marijuana, but no marijuana is discovered in a subsequent search, it is for the fact-finder to determine whether this testimony is credible).

Undeterred by this authority, Axon contends that the smell of marijuana, by itself, can no longer establish probable cause in Florida because the state legalized hemp and medical marijuana in 2018.  (Doc. 69 at 20, 21 n.4) (citing Fla. Stat. § 381.986 (defining the medical use of marijuana); Fla. Stat. § 893.02(3) (excluding hemp from the definition of cannabis); 21 U.S.C. § 802(16)(B)(i) (excluding hemp from the definition of marijuana)).  This argument is unavailing.

The recent in-District opinion in *United States v. Hardin*, 2022 WL 19267 (M.D. Fla. Jan. 3, 2022) is informative in this regard.  Akin to the situation here, the defendant in *Hardin* maintained that "the smell of marijuana [could not] contribute to a finding of reasonable suspicion because hemp was legal in Florida at the time of the [challenged] stop" and that rulings issued by courts before then were "outdated."  *Id*. at *3.  The court in *Hardin* rejected this argument, noting that "the Eleventh Circuit continues to affirm that the smell of burnt marijuana can provide probable cause to search a vehicle."  *Id*. at *4 (citing *United States v. Reed*, 2021 WL 5629980, at *2 (11th Cir. Dec. 1, 2021) (per curiam); *Merricks v. Adkisson*, 785 F.3d 553, 560 n.3 (11th Cir. 2015)).  Florida state courts have reached a similar conclusion.  *See, e.g.*, *Owens v. State*, 317 So. 3d 1218, 1220 (Fla. Dist. Ct. App. 2021) ("[W]e conclude that the recent legalization of hemp, and under certain circumstances marijuana, does not serve as a sea change undoing existing precedent, and we hold that regardless of whether the smell of marijuana is indistinguishable from that of hemp, the smell of marijuana emanating from a vehicle continues to provide probable cause for a warrantless search

of the vehicle.").  Notably, Axon does not cite a single decision to the contrary.[22]  *Cf.*

*Hardin*, 2022 WL 19267, at *4 (highlighting that the defendant "cite[d] no authority

for his argument that Florida's new hemp law change[d] th[e probable cause]

analysis").

## D.

Lastly, Axon asserts that the contraband seized during the July 2021 stop should

be excluded as the "fruit of the poisonous tree" because it was based on the arrest

warrants issued as a result of the allegedly unconstitutional October 2020 stop.[23]

"Ordinarily, evidence secured by the exploitation of the illegality of a search or seizure

is 'the tainted fruit of a poisonous tree' and is not admissible at trial."  *United States v.*

*Waksal*, 709 F.2d 653, 662 (11th Cir. 1983) (citing *Wong Sun v. United States*, 371 U.S.

471 (1963) and *Dunaway v. New York*, 442 U.S. 200, 218–19 (1979)); *see also United*

*States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) (per curiam) ("Evidence seized

after an illegal seizure should be suppressed as the 'fruit of the poisonous tree.'")

(citation omitted).

---

[22]Axon instead relies on caselaw holding that a law enforcement officer violates the Fourth
Amendment by detaining an individual for possessing a firearm in a state that allows for open carry.
(Doc. 69 at 22) (citations omitted); *see, e.g.*, *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013)
("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more,
cannot justify an investigatory detention.  Permitting such a justification would eviscerate Fourth
Amendment protections for lawfully armed individuals in those states.").  This authority is inapposite.
[23] Axon asserted in his motion that the July 2021 stop was also constitutionally infirm because it was
unduly prolonged.  (Doc. 23 at 13).  Axon, however, did not advance this contention in his proposed
findings of fact and conclusions of law (Doc. 69) and confirmed at oral argument that he was no longer
pursuing it.

In evaluating whether evidence constitutes fruit of the poisonous tree, "the relevant question is 'whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *Davis*, 313 F.3d at 1302–03 (quoting *Wong Sun*, 371 U.S. at 488).  The Supreme Court has identified several factors pertinent to this inquiry: the "'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search;" the "presence of intervening circumstances;" and the "purpose and flagrancy of the official misconduct."  *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

Axon's fruit of the poisonous tree argument can be readily disposed of.  In light of my finding that Axon's Fourth Amendment rights were not violated by Rousseau's October 2020 stop of the Acura and the subsequent seizure of the weapon from that vehicle, Axon's July 2021 arrest based on the warrants stemming from that incident was not tainted by the claimed prior illegality.  Accordingly, the evidence obtained in connection with the July 2021 stop is not subject to suppression under the fruit of the poisonous tree doctrine.[24]

---

[24] Having recommended a resolution of these matters on the merits, I need not address the government's suggestion that that the Court deny the portion of suppression motion referencing the October 2020 stop as moot on the basis that it would not present any evidence about that incident except for the "existence of the arrest warrant."  (Doc. 68 at 2 n.1).

III.

In light of the foregoing, I respectfully recommend that Axon's motion to suppress (Doc. 23) be denied.

Respectfully submitted this 30th day of June 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Virginia M. Hernandez Covington, United States District Judge
Counsel of record